IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT URBANA



FILED
JUL 07 2021
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 21-cr-20039 |
| Plaintiff, | ) | |
| | ) | VIOLATIONS: |
| v. | ) | |
| | ) | 18 U.S.C. § 1347 |
| LINUS ANUKWU, | ) | 18 U.S.C. § 1343 |
| | ) | 21 U.S.C. § 846 |
| Defendant. | ) | 18 U.S.C. § 1035 |

SEALED

## INDICTMENT

The Grand Jury charges:

### COUNT 1
(Health Care Fraud)

#### Background

At all times material:

1. LINUS ANUKWU was a medical doctor who owned and operated Bayview Family Clinic, Ltd. ("BFC"). BFC operated three facilities, one in Savoy, IL and two in Danville, IL.

2. ANUKWU offered an outpatient opioid addiction treatment program at BFC's Savoy, IL facility. This program involved the use of the drug Buprenorphine, which was known by a number of brand names, including Suboxone, Subutex, and Zubsolv.

3. Buprenorphine was a Schedule III controlled substance, that is, it had a potential for abuse and, even when used as prescribed, could cause physical and

psychological dependence. When properly prescribed, buprenorphine could be used to treat individuals suffering from opioid addiction.

4. Due to the potential for abuse and misuse among people who were already suffering from an addiction to opioids, the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who are substance abusers. 42 U.S.C. § 290aa.

5. SAMHSA and the Drug Enforcement Administration ('DEA") put in place a licensing/registration regimen, wherein licensed physicians who were already registered with the DEA to prescribe controlled substances could receive specialized training and apply for authorization to prescribe Buprenorphine to treat opioid addiction. After meeting SAMHSA's requirements, applicants received a second registration from the DEA, known as a DEA "X-number," which allowed these physicians to lawfully prescribe Buprenorphine.

6. Insurance coverage and payment for substance abuse treatment and testing was available through both public and private "health care benefit programs" (as defined in Title 18, United States Code, Section 24(b)) such as

Medicare, Medicaid, Health Alliance Connect, and Blue Cross Blue Shield of Illinois. Health care benefit programs are often referred to as "health insurance."

7. In order for a health care benefit program to pay for buprenorphine, a valid prescription had to be filled out and signed by an authorized physician in the usual course of their professional practice and issued for a legitimate medical purpose.

8. During the relevant time period, ANUKWU was the only medical professional at BFC who was authorized to treat opioid addicted patients by prescribing buprenorphine.

9. In order to be paid for services rendered, physicians like ANUKWU and/or medical practices like BFC had to submit a "claim" to a patient's health care benefit program.

10. When submitting claims to health care benefit programs, medical providers, like ANUKWU and BFC, used numeric "codes" taken from a manual published by the American Medical Association (AMA) of Current Procedural Terminology. These "CPT codes" describe the service provided to the patient. Providers also submitted similar codes, taken from the Healthcare Common Procedure Coding System (HCPCS) to describe a range of products and services not included in the CPT codes. Both CPT and HCPCS codes were products of the AMA, who determined appropriate definitions for each code. By submitting

claims using these codes, providers represented that the services associated with a code's description were, performed, provided, and medically necessary.

11. Upon receipt of claims from medical providers, which detailed the relevant CPT and HCPCS codes for each patient, a health care benefit program was responsible to pay for those claims, services, and prescription medications that were: (1) medically necessary; (2) actually rendered; (3) provided and prescribed by a properly licensed service provider; and (4) which otherwise complied with the terms of the health care benefit program, including co-insurance and deductibles.

12. Urine Analysis ("UA") was a common strategy used by substance abuse treatment centers and medical professionals to detect recent drug or alcohol use by a patient and monitor their compliance with the substance abuse program.

13. There were two primary categories of UA drug testing. First, there was presumptive testing, which indicated the possible, but not definitive, presence of a drug in a patient's urine. Second, there was definitive testing, which provided specific identification of individual drugs present in a patient's urine. Certain methods of definitive testing could determine not just the presence of a drug(s) but could also determine the amount of the drug in a patient's urine specimen.

14. Like other medical tests, UA testing could be billed and reimbursed pursuant to the terms of the health care benefit program. Health care benefit

programs were only responsible to pay claims for UA testing that was medically necessary, actually performed, and conducted by a properly licensed and certified service provider. The rate at which the provider was reimbursed was related to the complexity of the test performed.

15. Presumptive UA testing typically involved collecting urine in a specific cup designed for testing. The specimen was analyzed using a color band or numbered dipstick, allowing for visual positive or negative results. These cups usually tested for the presence of 9 to 13 specific types of drugs. Presumptive tests were less costly than definitive tests, and the results could be read quickly. Presumptive testing was the most common form of UA testing performed at treatment facilities as it did not require highly skilled and trained staff and expensive equipment.

16. Definitive UA testing was more complex, expensive, and detailed. Definitive UA testing included methods such as gas liquid chromatography-mass spectrometry, gas chromatography, and/or high-performance liquid chromatography to analyze a patient's urine specimen. These techniques were highly sensitive and accurately and definitively identified specific substances and the quantitative concentrations of the drugs and their metabolites. Results of definitive testing took longer, and the tests were significantly more expensive than presumptive testing. Depending on the number of tests conducted, single urine

specimens that underwent definitive testing could be billed to health care benefit programs for thousands of dollars.

## The Scheme to Defraud

17. Beginning at least as early as April 2014 and continuing to at least November 2016, in the Central District of Illinois and elsewhere,

**LINUS ANUKWU,**

defendant herein, did knowingly engage in a scheme and artifice to defraud health care benefit programs, including Medicaid, Medicare, private insurance companies, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

18. As part of the scheme and artifice to defraud, ANUKWU established policies and procedures at BFC which directly benefitted himself financially and which defrauded health care benefit programs, including Medicaid, Medicare, and private insurance companies. Under these policies and procedures, BFC submitted claims for payment for certain services and tests that were not actually conducted and provided, not conducted and provided to the extent billed, and which otherwise did not qualify for payment separate from, and in addition to, the basic service claimed.

It was further a part of the scheme and artifice to defraud that:

Unlawful Prescriptions

19. Prior to dates when he knew he would not be present at BFC, ANUKWU furnished blank pre-signed prescription forms to members of BFC's staff.

20. ANUKWU placed his signature on the blank prescription forms so that members of BFC staff could print controlled substance prescriptions onto the forms, thereby giving the appearance that ANUKWU, as the treating physician, had actually reviewed and signed the prescription.

21. These pre-signed prescription forms were distributed to patients that ANUKWU did not examine on the date of the prescription. Thereafter, these prescriptions were presented by patients to pharmacies, causing health care benefit programs to pay for these prescriptions.

Billing for Unseen Patients

22. It was further part of the scheme and artifice to defraud that ANUKWU submitted or caused to be submitted claims to health care benefit programs that falsely claimed ANUKWU had rendered services to patients when either he or the patient were not present and, therefore, could not have been seen.

23. In such instances, ANUKWU made entries and caused entries to be made into the records of BFC patients which indicated ANUKWU had seen and examined the patient, knowing such entries were false.

24. On the basis of these fraudulent record entries, BFC submitted claims to health care benefit programs which asserted that BFC was entitled to compensation for ANUKWU's examination of these patients even though he had not seen them. BFC submitted these claims both when ANUKWU was not physically present in the office and, on occasion, when the patients themselves had failed to appear for their appointment.

25. By submitting claims related to patients who had not been seen by ANUKWU, BFC received and attempted to receive compensation from the health care benefit programs to which it was not entitled.

Billing for Services Which Were Not Provided

26. It was further part of the scheme and artifice to defraud that ANUKWU submitted and caused to be submitted claims using CPT codes and HCPCS codes which falsely asserted ANUKWU had provided services which were not rendered and were not rendered to the extent claimed.

27. Among these false assertions were the use of codes in claims which represented ANUKWU had provided prolonged services to his patients. In reality, ANUKWU did not routinely provide prolonged services to patients. BFC staff scheduled multiple patients for ANUKWU in the same fifteen-minute scheduling block. In some instances, it would have been necessary for ANUKWU to work more than 24 hours in a single day in order to justify the CPT and HCPCS codes

reflected on the claims that BFC had submitted to health care benefit programs for payment.

28. By submitting claims with codes for services which ANUKWU did not render and did not render to the extent claimed, ANUKWU caused and attempted to cause health care benefit programs to compensate BFC in greater amounts than would have been received had the claim submissions reflected the services which had actually been provided.

Urine Analysis Testing

29. It was further part of the scheme and artifice to defraud that ANUKWU submitted and caused to be submitted false claims to health care benefit programs representing that BFC had provided definitive UA drug tests.

30. In reality, BFC only performed presumptive UA. BFC did not have the equipment, personnel, training, and certification to perform definitive UA testing.

31. By submitting claims for definitive UA testing that had not been performed, BFC received and attempted to receive compensation from the health care benefit programs to which it was not entitled.

All in violation of Title 18, United States Code, Section 1347.

## Counts 2 – 6
## (Wire Fraud)

32. The grand jury realleges and incorporates by reference the allegations set forth in paragraphs 1 – 31 as if fully set forth herein.

### Wire Communications

33. On or about each of the dates set forth below, in the Central District of Illinois and elsewhere,

## LINUS ANUKWU,

defendant herein, for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly cause to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Date | Wire Communication | Patient |
|---|---|---|---|
| 2. | 07/12/2016 | Claim submitted to Blue Cross Blue Shield of Illinois. | K.K. |
| 3. | 07/12/2016 | Claim submitted to Health Alliance Connect. | T.B. |
| 4. | 07/27/2016 | Claim submitted to Health Alliance Connect. | M.S. |
| 5. | 08/17/2016 | Claim submitted to Health Alliance Medical Plans. | A.G. |
| 6. | 09/07/2016 | Claim submitted to Blue Cross Blue Shield of Illinois. | L.B. |

All in violation of Title 18, United States Code, Section 1343.

## Count 7
### (Conspiracy to Commit Unlawful Dispensing and Distribution of Controlled Substances by Registrant)

34. The grand jury realleges and incorporates by reference the allegations set forth in paragraphs 1 – 31 as if fully set forth herein.

35. Beginning as early as April 2014 and continuing to in and around November 2016, in the Central District of Illinois and elsewhere,

**LINUS ANUKWU,**

defendant herein, who was subject to the requirements of the regulations related to the manufactures, distributors, and dispensers of controlled substance as articulated in 21 U.S.C. §§ 821-831, knowingly and unlawfully conspired with others, known and unknown to the grand jury, to distribute and dispense a quantity of buprenorphine, also known as Suboxone or Subutex, a Schedule III controlled substance, contrary to the provisions of 21 U.S.C. § 829(b), and 21 U.S.C. § 842(a)(l), (c)(2)(A).

All in violation of title 21, United States Code, Section 846.

## Count 8
### (False Statement Relating to Health Care Matters)

36. From in and around April 2014 and continuing to in and around November 2016, in the Central District of Illinois and elsewhere,

**LINUS ANUKWU**

defendant herein, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, the nature and extent of the services he provided to patients of BFC, in connection with the delivery of health care benefits, items, and services involving: (1) Blue Cross Blue Shield of Illinois; (2) Health Alliance Connect; and (3) Health Alliance Medical Plans, all health care benefit programs as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Section 1035.

A True Bill,
s/Foreperson

_____
Foreperson

s/Doug McMeyer

DOUGLAS J. QUIVEY
ACTING UNITED STATES ATTORNEY
DFM